**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **EUGENE ABRAMOV**,<br><br>　　　　Plaintiff,<br><br>　　　　*v.*<br><br>**SHAWN BULLARD**, et al.,<br><br>　　　　Defendants/Counter Claimants,<br><br>　　　　*v.*<br><br>**EUGENE ABRAMOV**,<br><br>　　　　Counter Defendant. | **CIVIL ACTION**<br><br><br>**NO. 24-4172-KSM** |

**MEMORANDUM**

**MARSTON, J.**　　　　　　　　　　　　　　　　　　　　　　　**June 26, 2026**

This is a classic landlord-tenant dispute made unnecessarily complex by a potential future attorney and a landlord who uses too many corporate forms. Pro se Plaintiff, and recent Temple Law graduate, Eugene Abramov brings claims for disgorgement of rent payments against his former landlord, Defendant 1620 Cecil B. Moore LLC; the related, property management company, Defendant Konkrete Investments LLC; and the owner of both companies, Defendant Shawn Bullard. (Doc. No. 34.) Defendants have counterclaimed for recovery of unpaid rent. (*See* Doc. No. 49 at 16–17.) The case was tried to the Court, without a jury, on February 18, 2026. (*See* Doc. No. 72 ("Trial Tr.").) After reviewing the parties' proposed findings of fact and

conclusions of law (Doc. Nos. 74, 75.[1]) and the evidence admitted at trial,[2] the Court issues the following Findings of Fact and Conclusions of Law.  *See* Fed. R. Civ. P. 52(a) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately.").

## FINDINGS OF FACT

**I.      THE LEASE**

1.      On April 16, 2023, Abramov signed a lease for 1620 Cecil B. Moore Ave, Apartment 003, Philadelphia, Pennsylvania 19121.  (Trial Ex. D1 at 1.)

2.      The lease identifies "Konkrete Investments LLC" as the "Landlord" on the first page, and it lists "Konkrete Investments INC [sic]" underneath the signature line set aside for the "LANDLORD OR MANAGING AGENT."  (*Id.* at 1, 3, 11.)

3.      The signature field for Konkrete Investments was signed with the typed name, "1620 CECIL B MOORE LLC."  (*Id.* at 3, 11.)

4.      The lease identifies the rental period as beginning August 1, 2023, and ending July 25, 2024.  (*Id.* at 1.)

5.      And it notes the total rent owed to "Landlord" for that period is $14,400, which is to be paid in monthly installments of $1,200.  (*Id.*)

6.      The lease also requires a separate security deposit of $1,200.  (*Id.*)

---

[1] Abramov appears to have filed his proposed findings of fact and conclusions of law twice.  (*See* Doc. Nos. 75, 76.)  In this Memorandum, the Court references only the former (Doc. No. 75).

[2] At the beginning of trial, the parties agreed that there were no objections to either side's exhibits.  (*See* Trial Tr. at 15:23–17:17.)  Accordingly, all exhibits were admitted, and the Court considers them here.  When referencing an exhibit, the Court refers to it as "Trial Ex." and the identifier given by the introducing party, e.g., "Trial Ex. D1."

7.      With the lease, Abramov received a *Partners for Good Housing* brochure prepared by the City of Philadelphia's Department of License and Inspections (*id.* at 16–39), a *Protect Your Family from Lead in Your Home* brochure prepared by the United States Environmental Protection Agency ("EPA") (*id.* at 40–58), and a *Bed Bug Prevention, Detection, and Control* pamphlet prepared by EPA (*id.* at 59–60).

8.      The lease does not include a Certificate of Rental Suitability for Abramov's unit. (*See generally* Trial Ex. D1; *see also* Trial Tr. at 168:19–170:12.)[3]

9.      The lease also does not identify a real person as the property manager, nor does it provide contact information for any such person. (*See generally* Trial Ex. D1; *see also* Trial Tr. at 171:12–14.)

## II.      DEFENDANTS' CORPORATE STRUCTURE

10.     Defendant Shawn Bullard owns Defendants 1620 Cecil B. Moore and Konkrete Investments, as well as non-party, Watchmen Property Management ("Watchmen PM"). (Trial Tr. at 145:22–146:11.)

11.     Bullard uses these companies, and others, to hold title, lease, and manage the more than 150 units that he holds out for rent in Philadelphia. (*Id.* at 145:25–146:20.)

12.     For the unit rented by Abramov, 1620 Cecil B. Moore owns the apartment building (and was, therefore, Abramov's ultimate landlord); Konkrete Investments and Watchmen PM manage the units in the building, performing physical maintenance and communicating with tenants about maintenance; and non-party City Wide Realty, Inc. (which is

---

[3] There is no dispute that Abramov's unit was covered by a Certificate of Rental Suitability when Abramov signed the lease. (*See* Trial Ex. D3.) Abramov was not, however, provided a copy of that Certificate.

not owned by Bullard), manages Bullard's real estate portfolio, including "the contracts" and "licenses" related to renting out his many units.  (*Id.*; *see also id.* at 176:11–177:13.)

13.     Bullard's companies are headquartered at 1611 W. Montgomery Avenue, but City Wide Realty, Inc., is not.  (*Id.* at 174:21–175:10.)

**III.     ABRAMOV'S TENANCY**

14.     On June 29, 2023—about a month before the start of the rental period—Abramov received the following text message from a phone number that the Court will refer to as the "Watchmen PM phoneline"[4]:

> Hi Eugene V., Watchmen Property Management has invited you to activate your Online Portal. Activate now at https://appfol.io/6QbQ5bgW Questions? Call (267) 519-2359 Reply STOP to unsubscribe.

(Trial Ex. M at 1.)

15.     And on August 3, 2023, Watchmen PM sent the following message using the same number:

> Good morning to all the new tenants! As you settle into your new apartment, we kindly request that you make a list of any issues that need to be fixed in your unit. Please write your name and apartment number on the list and on August 31st place the list in the mailbox at the office located at 1611 W. Montgomery Ave. Maintenance will coordinate with you for repairs starting in September. Starting in September, for future maintenance requests, please use the portal . . . .

(*Id.*)

16.     Abramov communicated with Watchmen PM at this number throughout his tenancy about maintenance issues, noise concerns, and fees that he believed were improper.  (*See generally id.*)

---

[4] During trial, this number was sometimes referred to as the "Appfolio number."  (*See, e.g.*, Trial Tr. at 60:8–16.)

17.     Watchmen PM consistently provided timely responses to Abramov's concerns. (*See generally id.* (documenting more than 45 messages sent by management to Abramov during his tenancy).)[5]

18.     Three concerns require particular discussion here: assessment of a late fee in September 2023, sewage overflowing from a clogged grinder pit in September 2023, and sewage overflowing from the same clogged grinder pit in March 2024.

### A.      Assessment of a Late Fee

19.     On September 6, 2023, Abramov was assessed a $100 fee for failing to timely pay his electric bill.  (*See* Trial Ex. D7 at 1 ("Late Fee – Rent and utilities are not received in full").)

20.     That same day, Abramov spoke with Maggie Bullard, an employee of Watchmen PM,[6] at a separate number that the Court will refer to as "M. Bullard's number."  (Trial Ex. O at 1.)

21.     Maggie Bullard explained that Abramov needed to have the electrical account placed in his name, and she provided the contact information for the utility company.  (*See id.*; *see also* Trial Ex. Q (Abramov summarizing his discussions with Maggie Bullard in an email to City Wide Realty).)

22.     Abramov made the necessary changes and informed Maggie Bullard.  (Trial Ex. O at 1.)

---

[5] Indeed, management almost always responded in a timely and professional manner, despite the condescending and hostile tone of many of Abramov's messages.  (*See, e.g.*, Trial Ex. D5 at 16 ("If you know whoever is in charge, tell them one more strike and I'll have enough for a tort case that might make him pay punitive damages."); *id.* at 13 ("[N]on-payment of PECO bills is absolutely not grounds for eviction, so I would love to see her try."); *id.* at 10 ("I'm filing complaints on October 25 if this isn't settled by then.").)  Many of Abramov's messages are not only highly discourteous and rude, but also particularly inappropriate for a potential future member of the bar.

[6] Maggie Bullard is Shawn Bullard's mother and served as controller for his businesses.  (*See* Trial Tr. at 151:25–152:9.)

23.     However, the late fee was not immediately removed from his account, and at the end of September 2023, Abramov sent a "Letter of Demand" disputing the fee to numerous individuals and addresses associated with his lease.

### i.     By Email to City Wide Realty

24.     On September 25, 2023, Abramov emailed a copy of his "Letter of Demand" to Elana Bogatova, an employee of City Wide Realty.  (Trial Ex. Q at 6.)

25.     Abramov had previously had lengthy correspondence with Bogatova about the disputed utility fee and other issues.  (*See id.* at 1–5.)

26.     During that correspondence, Bogatova had explained that Watchmen PM "is the Landlord's management company" and that City Wide Realty was "hired by the Landlord to handle leasing, renewals, rent payments as a part of his management crew. . . . You can contact me if you have any payment questions."  (*Id.* at 3.)

27.     Abramov's Letter of Demand summarized the fee dispute and requested that the $100 fee be removed from his account.  (Trial Ex. X; *see also* Trial Tr. at 97:8–18.)

28.     On September 26, 2023, Bogatova responded to the Letter of Demand by stating, as relevant here, "[Y]our PECO remains unpaid.  That alone is grounds for eviction not only the late fees.  Please do not contact me in regards to this matter any further."  (*Id.* at 7.)

### ii.     By Certified Mail to Konkrete Investments, LLC

29.     Also on September 25, 2023, Abramov sent copies, via certified mail, of his Letter of Demand to Konkrete Investments at two addresses identified in company filings with the Pennsylvania Secretary of State.  (*See* Trial Ex. G (listing address for Konkrete Investments, LLC and Konkrete Investments, Inc. as 1109 Lehigh Ave.); Trial Ex. H (copy of envelope sent to 1109 W. Lehigh Ave.); Trial Ex. I (identifying Shawn Bullard as the incorporator for Konkrete

Investments, Inc. and listing his address as 2317 E. Firth St.); Trial Ex. J (copy of envelope sent care of Shawn Bullard to 2317 E. Firth St.).)

30.    Both mailings were returned as undeliverable.  (*See* Trial Ex. H (noting address was vacant); Trial Ex. J (marking envelope as "return to sender unable to forward").)

### iii.    By Text and Email to Watchmen PM

31.    The same day that Abramov emailed Bogatova and mailed his letter to Konkrete Investments, he also texted a copy of the Letter of Demand to the Watchmen PM phoneline. (Trial Ex. M at 5–6.)

32.    During the exchange that followed, Abramov asked for the email address for Watchmen PM, and management responded that it was: watchmenpm@gmail.com.  (*Id.* at 6.)

33.    Abramov emailed a copy of the Letter of Demand to that address the next day, September 26, 2023.  (Trial Ex. N at 1.)

34.    Abramov immediately received an automated response, which promised a more fulsome response "shortly."  (*Id.* at 2.)

35.    On October 1, 2023, Abramov sent three additional text messages to the Watchmen PM phoneline, stating, "As I wrote in the letter of demand, I'm placing the $100 added as a fine in escrow," "I am still waiting for the landlord to talk to me about it," and "I'm filing complaints on October 25 if this isn't settled by then."  (Trial Ex. M at 10–11.)

36.    Management did not respond.  (*See id.*)

37.    The next day, October 2, 2023, Abramov sent three additional messages, stating, "To simplify the dispute resolution process, I've decided to pay the unlawful $100 and then just take the landlord to court for it," "There has been no reply from watchmenpm@gmail.com," and "Can you please get me the phone number of any company officer?"  (*See id.* at 11.)

38.    Again, management did not respond.  (*See id.*)

### iv.    In Person to Maggie Bullard

39.    On October 2, 2023, Abramov went in person to Watchmen PM's office at 1611 W. Montgomery Ave.  (Trial Tr. at 63:6–64:14)

40.    While there, Abramov spoke with Maggie Bullard, who informed him that the office was the business address for Watchmen PM and Konkrete Investments.  (*Id.*)

41.    According to Abramov, Maggie Bullard initially tried to "assign responsibility" for the $100 utility fee to Elana Bogatova at City Wide and the real estate agent who had helped Abramov find the apartment.  (*Id.*)

42.    Abramov tried to give Maggie Bullard a copy of his demand letter, but she refused to take it.  (*Id.*)

43.    Abramov left the meeting and returned home, at which point he texted M. Bullard's number a copy of his demand letter and said, "As I mentioned, I need the legal contact info of my landlord to notify them in writing should I need to withhold rent and put it in escrow." (Trial Ex. O at 4 (showing that Abramov texted photos of multiple blank grey pages).)

44.    The following exchange then occurred:

| | |
|---|---|
| Maggie Bullard: | You texted me 10 letters and they all look the same |
| Abramov: | Are you my landlady, or a representative of Konkrete Investments LLC, yes or no? |
| Maggie Bullard: | No |
| Abramov: | What is the contact information of my landlord? |
| | [photographs of the portions of the lease identifying Konkrete Investments and 1620 Cecil B. Moore LLC as the landlord or managing agent] |
| | How do I contact my landlord? |

8

|  | 1620 Cecil B. Moore LLC<br>Konkrete Investments LLC<br>Konkrete Investments Inc. |
|--|--|
|  | Who signed my lease? Who do I provide official written notice to? |
| Maggie Bullard: | Eugene I am looking into the dispute over the $100. I will get back to you. Thank You. |
| Abramov: | [photograph of his written account of their meeting]<br><br>This is a factual account of our meeting I just wrote.<br><br>Since you're not my landlady, it's not for you but for my landlord. In good faith I'm sharing the statements I will submit with my complaint. |

(*Id.* at 4–7.)

45.     Little more than two weeks after Abramov's discussions with Maggie Bullard, the $100 fee was forgiven and credited back to him.  (Trial Tr. at 73:1–4, 98:2–5; Trial Ex. D at 1 (showing late fee credit applied to Abramov's account on October 18, 2023).)

## B.     September 2023 Sewage Overflow

46.     While Abramov was taking these steps in connection with the late fee on his account, a second issue arose.  On the morning of September 15, 2023, Abramov noticed that the sump pump in his unit was overflowing, covering his floors in sewage, and he submitted a maintenance request.  (Trial Ex. O at 3.)

47.     Because the unit is located partially below ground, sewage from the toilet goes through a grinder pit before being run into a sump pump, and finally, pushed into the public sewer.  (Trial Tr. at 158:9–25 (explaining that "the toilet fleshes [sic] into a grinder pit," which "grinds up all the feces and toilet paper and it ejects it out into the public sewer").)

48.     Abramov's grinder pit had stopped operating, causing the sewage to overflow into the apartment instead.  (*Id.* at 159:4–9.)

49.     Watchmen PM sent a plumber to Abramov's apartment within a few hours of receiving his maintenance request, and although, the plumber initially "fixed it," the sump pump began overflowing again after he left.  (Trial Ex. M at 3.)

50.     Abramov immediately submitted a second maintenance request, and Watchmen PM sent out a second plumber that same night.  (*Id.*)

51.     On the morning of September 16, 2023, Abramov texted the Watchmen PM phoneline that "water is still pooled under the laminate" flooring in his unit, so that when he stepped on the joints, water "bubbles up and there's a 'squish' sound."  (Trial Ex. M at 3–4.)

52.     Watchmen PM sent another maintenance person to the unit, who set up fans to dry out the flooring.  (Trial Tr. at 58:8–11.)

53.     Abramov did not complain about the issue again.  (*Id.* at 73:13–74:1 (testifying that he "stopped trying to contact" management about the issue because two to three weeks after the overflow, "the smell was abating, the water had evaporated, and the apartment was liveable again")).

C.      **March 2024 Sewage Overflow**

54.     Over the next six months Abramov and the Watchmen PM phoneline exchanged only a handful of messages, primarily related to package thefts that affected the entire apartment building.  (Trial Ex. M at 12–14.)

55.     Then, the morning of March 4, 2024, Abramov submitted another maintenance request, noting that his grinder pit had once again stopped working, and his "floor [wa]s flooded with sewage."  (*Id.* at 14–16.)

56. The Watchmen PM phoneline responded five minutes later, and the following exchange occurred:

> Watchmen PM: Hello! We've received your request for maintenance. We'll keep you updated on the exact day and time once we coordinate with our maintenance team. Please allow 24 – 72 hours for your maintenance request to be serviced. I am getting in contact with the plumbers now to see if they are available to come out Today. Thank you for your patience! Reply STOP to unsubscribe.
>
> Abramov: 24 hours is too slow. It smells like sewage and isn't livable.
>
> Toilet won't flush of course.

(*Id.* at 17; Trial Tr. at 104:22–105:12.)

57. At around 11:00 a.m. that day, Watchmen PM messaged Abramov again, this time informing him that maintenance would be "coming between noon and 2 o'clock." (Trial Ex. M at 17; Trial Tr. at 104:22–105:12.)

58. At 3:40 p.m., Abramov asked if "the water issue [was] fixed and the mess cleaned up," and management responded, "Yes." (Trial Ex. M at 17.)

59. Abramov was also provided dehumidifiers to dry out the flooring. (Trial Tr. at 76:18–20, 78:2–8, 107:8–16.)

60. Abramov did not send any further messages on this issue. (*See, e.g.*, Trial Tr. at 116:9–117:1, 119:2–5.)

## IV. ABRAMOV STOPS PAYING RENT

61. On March 18, 2024, Abramov texted the Watchmen PM phoneline, asking, "when can I deliver official written notice that I'm putting my rent in escrow and terms to resume payment?" (Trial Ex. M at 17.)

11

62.    Management did not respond to this message.  (*Id.*)

63.    Then on April 1, 2024, he texted the Watchmen PM phoneline and M. Bullard's number an extensive list of grievances:

> Good morning, happy Easter
>
> Pursuant to notice given to Maggie Bullard on March 4, the rent payment due today has been placed in Escrow for these reasons:
>
> - Unit has been flooded with sewage on March 4 despite the landlord having notice of this issue, as it happened in 2023
>
> - The landlord has not provided an adequate means of communication to resolve issues.
>
> - Black mold is on the underside of the laminate floor.
>
> - Cockroaches! [roach emoji]
>
> - It is stipulated in the lease the unit would be heated, but no heat was provided through the winter.
>
> - Trash and broken glass is strewn across the only way in or out of the building, and the building has been cited multiple times by city violations for this.
>
> - Landlord is aware of security issues with strangers breaking in several times but has only restored previous security mechanisms instead of adding new ones.
>
> - The question of compensating me on damaged personal property due to flooding has been ignored.
>
> - Maintenance equipment has been left in my unit.
>
> This might not be a complete list. Thank you for bringing this to my landlord's attention.

(Trial Ex. M at 17–18; Trial Ex. O at 9–10.)

64.    Maggie Bullard, who had been hospitalized a few months earlier, did not respond. (Trial Ex. O at 7–10.)

65.    However, on April 4, the Watchmen PM phoneline addressed his concerns:

> Greetings, I understand that when your unit experienced flooding, our emergency team promptly resolved the issue on the same day and maintained communication regarding the repair process. Regarding the stairs, it wasn't mold; rather, it was rust, which we promptly had inspected. While we've taken steps to address bugs setting up bait placement accessing the unit and hallway it remains a natural occurrence that insects find a way inside the building. Does your unit have a mini-split system for AC and heating[?] Regarding the trash situation, despite our repeated efforts to communicate with neighbors about proper disposal, it remains challenging to control their actions. Unfortunately, we cannot prevent others from opening doors for unauthorized individuals. It's important to note that renters insurance is recommended for situations like these for your personal items.

(Trial Ex. M at 18.)

66.    On April 8, 2024, Abramov sent another lengthy message replying to each point. (*See id.* at 19.)

67.    As relevant to the sewage overflow issue, Abramov stated only that his "unit experienced flooding three times.  Every time I had to leave the apartment. Every time it smelled like sewage for weeks.  I could excuse a one-time malfunction, but with three floods . . . .  I propose a $600 compensation for septic malfunction for nuisance.  The unit was contaminated for days with sewage water sloshing under the floorboards and the smell persisted for weeks." (*Id.*)

68.    Watchmen PM did not respond to this message.

13

## V.    ABRAMOV RECEIVES A NOTICE TO QUIT

69.    On May 13, 2023, Abramov received the following email:

(Trial Ex. S at 1.)

70.    He responded, "The rent's in escrow waiting on the landlord to make the unit habitable."  (*Id.* at 2.)

71.    A few days later, Abramov moved out of the unit.  (Trial Ex. Y.)

72.    He did not inform anyone associated with his landlord (e.g., Watchmen PM, Maggie Bullard, Elana Bogatova) that he had moved out, nor did he provide a forwarding address.  (*See* Trial Tr. at 30:13–20, 51:5–52:8, 164:17–19.)

73.    Abramov left furniture and trash in the unit.  (Trial Exs. D9–D10.)

14

74.    On May 21, 2024, management sent the following message to Abramov from the

Watchmen PM phoneline:

> We've received a message from the leasing department stating that you mentioned the unit is not habitable. I'm trying to understand this, as you've been living there for some time, and every issue you've reported has been addressed. You've never mentioned any further concerns about the unit's habitability.

(*Id.* at 20.)

75.    The following exchange then occurred:

| Abramov: | None of the issues have been addressed. If employees are reporting to you that they addressed them, that's a lie. Please see my April 8 message in this chat. |
|---|---|
| Watchmen PM: | Everything you listed was [t]aken care of |
| Abramov: | Ok, let's take everything one by one |
| | Where's my reimbursement for the damaged property |
| | Actually, how about you just take any evidence of how you 'took care' of the issues to court when I file to get my security deposit back. |
| | Just so you know, the little errors on the LLC's addresses won't excuse you keeping my deposit. Refusing to sign the demand letter won't excuse you. Signing the demand letter as 'temple' won't excuse you. I will walk the bailiff right to your office to serve Watchmen Property Management and Shawn Bullock the court complaint to get the deposit back. I will ask for triple damages as I'm entitled to by law. The judge can decide who's right. |
| | *double the amount, not triple. My bad. |

(*Id.* at 21.)

15

76.     Watchmen PM did not respond to these openly hostile messages, and no further conversations occurred between Abramov and management through the Watchmen PM phone line.  (*See generally* Trial Ex. M.)

## VI.     ABRAMOV RECEIVES A NOTICE TO VACATE

77.     On June 7, 2024, Baritz Law Associates LLC sent a letter to Abramov with the subject line, "NOTICE TO VACATE."  (Trial Ex. T at 1.)

78.     The law firm explained that it "represent[s] the owner of [1620 Cecil B. Moore #3], which you occupy.  The balance owed is $4175.00.  You must vacate the leased premises within [t]hirty (30) days from the date of this letter unless you pay the above balance in full to your landlord."  (*Id.*)

79.     The Notice to Vacate included a notice of rights that explained Abramov's right to participate in the City of Philadelphia's free Eviction Diversion Program under the Philadelphia Code.  (*Id.* at 2.)

80.     The Notice to Vacate was sent to Abramov at the Cecil B. Moore address for the rental unit and later forwarded by the United States Postal Service to his summer address in Bangor, Maine.  (Trial Tr. at 31:1–3.)

81.     On June 13, 2024—before Abramov received the Notice to Vacate at his forwarding address—Abramov emailed a representative of Baritz Law,[7] explaining that "the landlord already evicted [him] in a flagrant violation of due process.  The landlord notified [him] on May 13 that [his] right to possess the property would end in 10 days."  (Trial Ex. V. at 1.)

---

[7] The contact information for Baritz Law was given to Abramov by someone with the Philadelphia Diversion Program, who contacted Abramov on June 13, 2024.  (*See* Trial Tr. at 30:23–31:1.)

82.     Abramov also explained that although "[he] had been holding rent in escrow . . . [he] decided not to take [his] chances" and vacated the apartment immediately instead of risking eviction.  (*Id.*)

83.     And he stated that the Notice to Quit email had caused him to "abandon some personal belongings, around $1,500 worth in the unit.  [He] also fe[lt] that [he was] entitled to the return of [his] $1200 security deposit."  (*Id.*)

84.     The next day, Abramov received the Notice to Vacate letter, and he sent a second email to Baritz Law asserting violations of the Federal Debt Collection Practices Act (FDCPA) and offering to settle his forthcoming claims.  (*Id.* at 2.)

85.     On June 25, 2024, Abramov sent yet another email to Baritz Law, this time including a draft FDCPA complaint.  (*Id.* at 3.)

86.     Abramov also offered again to settle his claims against Baritz Law and provided his summer address in Bangor, Maine.  (*Id.*)

87.     He did not ask Baritz Law to share his current address with his landlord or with Konkrete Investments, Watchmen PM, or City Wide Realty.  (*See generally id.*)

88.     Abramov's security deposit was not returned to him, and he never received an itemized list of deductions explaining why it had been withheld.  (Trial Tr. at 38:13–22.)

89.     In total, Abramov paid $10,800 to rent the unit, which includes $9,600 in lease payments and $1200 for the security deposit.  (*Id.* at 89:10–21, 127:5–7, 149:7–9.)

## CONCLUSIONS OF LAW

Abramov sues 1620 Cecil B. Moore, Konkrete Investments, and Shawn Bullard.  He brings claims for a violation of the Pennsylvania Landlord and Tenant Act for failure to return

his security deposit (*see* Doc. No. 75 at 5),[8] violations of the FDCPA in connection with the May 13, 2024 Notice to Quit email (*see id.* at 7), and violations of the Philadelphia Code for purported problems with the lease (*see id.* at 9–10).  Abramov also reasserts his claim for violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL), on which the Court granted Defendants' motion for judgment as a matter of law during trial.  (*Id.* at 10–11; Trial Tr. at 144:15–23.)  Defendants bring a single counterclaim for breach of contract to recover three months of unpaid rent.  (Doc. No. 74 at 10–11.)  For the reasons discussed below, none of the parties' claims succeed.  Accordingly, the Court does not address any party's request for damages, nor do we consider Abramov's request for equitable relief in the form of piercing the corporate veil.

## I.     ABRAMOV'S CLAIMS

### A.     Landlord and Tenant Act Claims

1.     First, Abramov claims Defendants violated Pennsylvania's Landlord and Tenant Act when they failed to return his $1200 security deposit or to provide a written list of damages for which the security deposit was being withheld.

2.     Section 250.512 of that Act states, "Every landlord shall within thirty days of termination of a lease or upon surrender and acceptance of the leasehold premises, whichever first occurs, provide a tenant with a written list of any damages to the leasehold premises for which the landlord claims the tenant is liable.  Delivery of the list shall be accompanied by payment of the difference between any sum deposited in escrow, including any unpaid interest thereon, for the payment of damages to the leasehold premises [i.e., the security deposit] and the

---

[8] Abramov's disjointed pleadings and trial memorandum make it difficult to understand the full scope of his claims.  In this Memorandum, the Court addresses those claims set forth by Abramov in his proposed findings of fact and conclusions of law (Doc. No. 75).  To the extent he asserted additional claims in his pleadings, those claims have been abandoned.

actual amount of damages to the leasehold premises caused by the tenant." 68 Pa. Stat. & Cons. Stat. § 250.512(a).

3.  If the landlord fails to provide the written list, it "forfeit[s] all rights to withhold any portion of sums held in escrow, including any unpaid interest thereon, or to bring suit against the tenant for damages to the leasehold premises." *Id.* § 250.512(b). And if the landlord fails to pay the tenant the difference between the security deposit and the actual damages, "the landlord shall be liable" for "double the amount" of the difference. *Id.* § 250.512(c).

4.  The Act includes two limiting provisions. First, "[n]othing in [§ 250.512(a)] preclude[s] the landlord from refusing to return the escrow fund, including any unpaid interest thereon, for nonpayment of rent or for the breach of any other condition in the lease by the tenant." *Id.* § 250.512(a). And second, the landlord is relieved "from any liability" under § 250.512 if the tenant fails to provide the landlord "with his new address in writing upon termination of the lease or upon surrender and acceptance of the leasehold premises." *Id.* § 250.512(e). These limiting provisions preclude recovery here.

5.  First, Defendants withheld Abramov's security deposit because he failed to pay rent, not because of damages to the unit. (*See* Trial Tr. at 215:2–16); *see also* 68 Pa. Stat. & Cons. Stat. § 250.512(a) (noting nothing in § 250.512(a) precludes the landlord from retaining a security deposit to cover "unpaid rent"); *id.* (requiring landlords to provide "a written list of any *damages*" and to pay the difference between the security deposit and "the actual amount of *damages to the leasehold premises* caused by the tenant" (emphases added)); *Reiter v. Hendricks*, 242 A.3d 412 (Table), 2020 WL 6690995, at *7 (Pa. Super. Ct. 2020) ("[T]he requirement to return a security deposit absent notice of actual damages only applies when the deposit is withheld as payment of damages to the leasehold premises. The statute explicitly

19

excludes from its mandates retention of a deposit for other breaches of the lease contract." (cleaned up)).

6.      Second, Abramov did not provide Defendants with a forwarding address, so Defendants were relieved of any duty to explain why they were withholding the security deposit. *See* 68 Pa. Stat. & Cons. Stat. § 250.512(e).  Abramov argues that he did not provide a forwarding address because it would have been futile, but the evidence adduced at trial shows Abramov had multiple means of informing Defendants that he had vacated the unit.  (Doc. No. 75 at 6.)  Most notably, he could have told the Watchmen PM phoneline that he had left when management contacted Abramov *after* he had vacated the unit.  (*See* Trial Ex. M at 22–23 (management texting Abramov on May 21, 2024—two days after he had vacated the unit—to ask why he described the unit as "not habitable" in his response to the leasing department's Notice to Quit email).)

7.      Abramov also argues that he did not need to send Defendants a forwarding address because when he initially signed the lease, he had given them his address in Bangor, Maine, and Defendants were fully aware of how to contact him by phone and email.  (Doc. No. 75 at 5–7.)  But § 250.512 does not require a landlord to "track down [a tenant's] forwarding address using the piecemeal information [that the tenant] provided previously." *Jarzyna v. Home Props., L.P.*, 114 F. Supp. 3d 243, 277 (E.D. Pa. 2015).  And although at least one state court has suggested § 250.512(e) does not "shield" a landlord who keeps a security deposit for reasons other than "not knowing where to mail the deposit," *Nitardy v. Chabot*, 195 A.3d 941, 949 (Pa. Super. Ct. 2018), that case is readily distinguishable.  In *Nitardy*, the landlord was aware that the tenants had moved out, the parties remained in email contact afterward, and the tenants provided the landlord with a forwarding address within 30 days of leaving the property, such that the

landlord "had the mailing information needed to comply with the security deposit provisions of the Act in ample time to do so."  195 A.3d at 944, 949.  Here, by contrast, Abramov did not tell Defendants that he had left the unit, let alone timely provide them with a forwarding address. *See Aspen Enters., LLC v. Thomas*, 242 A.3d 291 (Table), 2020 WL 6536630, at *6 (Pa. Super. Ct. 2020) ("To the extent Appellant relies on *Nitardy*, the facts of that case are distinguishable. Unlike the tenants in *Nitardy*, Appellant did not establish she stayed in email contact or provided a forwarding address upon terminating the lease.  Therefore, we hold that the trial court did not err in determining that Appellee could retain Appellant's security deposit to apply it against the cost of damages to the premises."  (citation omitted)).

*       *       *

For those reasons, the Court holds that Defendants are not liable to Abramov under Pennsylvania's Landlord and Tenant Act.

### B.    FDCPA Claims

8.    Second, Abramov brings claims for violations of the FDCPA against 1620 Cecil B. Moore LLC and Konkrete Investments[9] based on the Notice to Quit email that he received on May 18, 2024:

---

[9] The operative Second Amended Complaint only asserts this claim against Konkrete Investments; however, throughout trial, Abramov claimed it was being asserted against both corporate Defendants (and that Shawn Bullard was liable for such claims via veil piercing).  Defendants have not objected to the assertion of this claim against 1620 Cecil B. Moore, and to the contrary, appear to have acquiesced to it.  (*See* Doc. No. 74 at 8 (proposing that the FDCPA claim fails as against "Defendants").)



9.      To succeed on his FDCPA claims, Abramov had to prove that "(1) [h]e is a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a debt as the Act defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt." *Douglass v. Convergent Outsourcing*, 765 F.3d 299, 303 (3d Cir. 2014) (quotation marks omitted).  Abramov's FDCPA claims fail on the second element.

10.     A "debt collector" is "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or

asserted to be owed or due another." 15 U.S.C. § 1692a(6). A creditor[10] (e.g., a landlord) generally is not considered a "debt collector," because collecting debts is often not the "principal purpose" of a creditor's business, and when it does attempt to collect a debt, it is typically a debt owed to itself and not one owed to "another." *See Tepper v. Amos Fin.*, 898 F.3d 364, 366 (3d Cir. 2018) ("Creditors—as opposed to 'debt collectors'—generally are not subject to the Act." (quotation marks omitted and alterations adopted)); *Carlson v. Long Island Jewish Med. Ctr.*, 378 F. Supp. 2d 128, 130–31 (E.D.N.Y. 2005) ("[B]y its terms, the FDCPA limits its reach to those collecting the dues 'of another' and does not restrict the activities of creditors seeking to collect their own debts.").

11.     However, the FDCPA recognizes an exception under which a creditor is nevertheless considered a "debt collector" if "in the process of collecting [its] own debts, [the creditor] uses any name other than [its] own which would indicate that a third person is collecting or attempting to collect such debts." 15 U.S.C. § 1692a(6). This is known as the false name exception, and it has "three components: a creditor must (1) use a name other than its own (2) in a way that would indicate a third person is attempting to collect its debt (3) in the process of collecting its own debt." *Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, 942 F.3d 1200, 1209 (11th Cir. 2019). To determine whether the false name exception applies, courts consider "whether, under the particular factual circumstances present, the 'least sophisticated consumer would have the false impression that a third party was collecting the debt'" on the creditor's behalf. *Carlson*, 378 F. Supp. 2d at 131 (quoting *Maguire v. Citicorp Retail Servs., Inc.*, 147 F.3d 232, 236 (2d Cir. 1998)). This is "an objective standard," under which "the collection effort

---

[10] The FDCPA defines "creditor" as "any person who offers or extends credit creating a debt or to whom such a debt is owed." 15 U.S.C. §1692a(4).

is to be 'assessed in terms of the impression likely to be left upon the unsophisticated consumer.'" *Id.* (quoting *Maguire*, 147 F.3d at 236); *accord Pinson*, 942 F.3d at 1209; *Catencamp v. Cendant Timeshare Resort Grp.-Consumer Fin., Inc.*, 471 F.3d 780, 782 (7th Cir. 2006).[11]

12.     The false name exception does not save Abramov's FDCPA claims here.  For one, as Abramov concedes (*see* Doc. No. 75 at 10), 1620 Cecil B. Moore is the landlord for his unit, not Konkrete Investments, so only 1620 Cecil B. Moore can be considered a "creditor" attempting to collect "its own debt."[12]  For another, the least sophisticated consumer in Abramov's situation would have understood that the Notice to Quit email from the Watchmen PM email address was being sent by a property management company closely associated with his landlord.  *See Pinson*, 942 F.3d at 1211 ("The perspective of the least sophisticated consumer arises from the totality of circumstances . . . .").  Notably, before receiving the Notice to Quit, Abramov exchanged around 100 messages with Watchmen PM and knew from Maggie Bullard and his own research that Watchmen PM, Konkrete Investments, and 1620 Cecil B. Moore were sister companies that had the same owner and principal place of business.  *See, e.g.*, *Carlson*, 378

---

[11] The Third Circuit has not considered the false name exception in depth, but the Second, Seventh, and Eleventh Circuits have all held that "the false-name exception applies when the 'least sophisticated consumer' would believe a third party was involved in collecting a debt."  *Pinson*, 942 F.3d at 1209; *see Catencamp*, 471 F.3d at 782; *Maguire*, 147 F.3d at 236.  The Court finds the reasoning of *Pinson*, *Catencamp*, and *Maguire* persuasive.  *See Magness v. Walled Lake Credit Bureau, Inc.*, No. 12cv6586, 2014 WL 12610219, at *5 (E.D. Pa. Feb. 18, 2014) ("The Third Circuit has not addressed the false name exception in depth.  However, we find a recent Second Circuit decision to be instructive.").  Plus, the false name exception is consistent with the Third Circuit's holding that to give full effect to the FDCPA's remedial purpose, the Act "must be construed broadly," *Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 174 (3d Cir. 2015), and courts should consider whether a communication violates the FDCPA from the "perspective of the least sophisticated debtor."  *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008); *accord Riccio v. Sentry Credit, Inc.*, 954 F.3d 582, 594 (3d Cir. 2020).

[12] Although Konkrete Investments was technically attempting to collect "debts owed or due . . . another," Abramov has not shown by a preponderance of the evidence that it "regularly collects or attempts to collect" such debts.  *See* 15 U.S.C. § 1692a(6) (defining the term "debt collector").

24

F. Supp. 2d at 132 ("The liability of the Hospitals [under the false-name exception] turns on [among other things] the business of RCRS and the nature of its corporate relationship with the Hospitals.  It is also important to determine the nature of the contacts among the Hospitals, RCRS and Plaintiffs.  It is only when these facts are clarified that the court will be in a position to determine whether the least sophisticated consumer would have believed that the Hospitals or an unrelated third party was attempting to collect a debt.").  Because no one in Abramov's position would have believed that the Notice to Quit was sent by "an unrelated third party," he cannot rely on the false name exception.  *See id.*

*    *    *

Because Abramov has not proven that either 1620 Cecil B. Moore or Konkrete Investments is a debt collector, the Court holds that Defendants are not liable to Abramov under the FDCPA.

### C.    Claims for Philadelphia Code Violations

13.    Third, Abramov seeks disgorgement of the $9,600 in rent that Defendants collected throughout the lease period, arguing that Defendants violated Philadelphia Code §§ 9-3903, 9-3907, and 9-804(5).[13]  (Doc. No. 75 at 9–10.)  None of his claims succeed.

14.    First, §§ 9-3903 and 9-3907 require landlords, "at the inception of each tenancy, [to] provide to the tenant a Certificate of Rental Suitability," Phila. Code § 9-3903, and to "designate a Managing Agent for the property," who "must be a natural person . . . who has agreed to carry out the necessary responsibilities," *id.* § 9-3907.  Abramov is correct that Defendants failed to provide Abramov a copy of the Certificate and failed to designate a "natural

---

[13] Abramov has abandoned his other claims under the Philadelphia Code by not mentioning them in his proposed findings of fact and conclusions of law.

person" as the managing agent.  (*See* Trial Ex. A.)  But that does not mean Abramov is entitled to disgorgement of rent payments tendered while he lived in the unit.  Section 9-3901(4)(f) outlines the extent to which a tenant may bring a private right of action for violations of Chapter 9-3900 [which includes §§ 9-3903 and 9-3907], stating that any such tenant "shall have the right to bring an action against the owner . . . *to compel compliance* with this Chapter."  Phila. Code § 9-3901(4)(f) (emphasis added).  Pennsylvania courts have rejected attempts by tenants to expand the scope of this provision to permit disgorgement of lease payments made while the landlord was out of compliance with the Chapter.  *See Ricchetti v. Ellis*, No. 130502703, 2016 WL 5253395, at *6 (Pa. Ct. Comm. Pl. Sept. 7, 2016) ("[T]he failure of a landlord to have a housing inspection license or obtain and provide a Certificate of Rental Suitability and handbook to a tenant . . . does not . . . provide the tenant with a legal right to require the landlord to disgorge any rents that the landlord had collected from the tenant during the period of noncompliance."); *Goldstein v. Weiner*, No. 3964, 2011 Phila. Ct. Com. Pl. LEXIS 419, at *13–14 (Pa. Ct. Comm. Pl. Dec. 14, 2011) (collecting cases and finding that "[w]hat the foregoing cases have in common is that . . . they did not require disgorgement by the unlicensed party of payments received while in violation of the statute").

15.    Second, § 9-804(5)[14] prohibits a landlord from accepting rent until it "has given a fully executed copy of the lease to all the parties to the lease."  Abramov argues that the copy of

---

[14] Section 9-804 does not appear in Chapter 9-3900, and therefore, is not subject to the limitations on recovery discussed above.  But this section does include its own provision outlining a tenant's right to bring a private cause of action: "Any person aggrieved under the provisions of this Section may file a complaint with the Fair Housing Commission or may allege any violations in an initial pleading or, where appropriate, in a responsive pleading in a court of competent jurisdiction."  Phila. Code. § 9-804(14). Although this provision allows inclusion of § 9-804 claims in an "initial pleading," there is nothing to suggest it allows a plaintiff to seek disgorgement of all past rent based on a failure to provide an executed copy of the lease.  This Court is particularly reticent to find as much given the similarities between the language of § 9-804(5) (preventing a landlord from "accept[ing]" rent until it provides an executed copy of the lease) and § 9-3903 (preventing a landlord from "collect[ing]" rent until it provides copies of

the lease that he received was not "fully executed" because the signature field for Konkrete Investments was signed with the typed name, "1620 CECIL B MOORE LLC," and not the name of a natural person. (Trial Ex. D1 at 3, 11.) This argument elevates form over substance. The undisputed evidence at trial showed that the lease was in fact signed by a natural person who had authority to enter the contract on behalf of 1620 Cecil B. Moore and Konkrete Investments. (*See* Trial Tr. at 171:15–23.) The Court will not find the contract "unexecuted" or "unenforceable" simply because that individual did not identify themselves or sign using their natural name, especially not when the corporate signatories *admit* they intended to be bound by the signature. *See* William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corps.* § 3007 (2025) ("Generally . . . mere informalities in the mode of executing the contract are not fatal to its enforcement."); *cf., e.g.*, *Spanierman Gallery, PSP v. Love*, 320 F. Supp. 2d 108, 112 (S.D.N.Y. 2004) ("[T]he Court will not permit the Plaintiffs to capitalize on that technical naming error in contravention of the parties' evident intentions.").

*    *    *

For those reasons, the Court holds that Abramov's claim for disgorgement of rent payments under the Philadelphia Code fails.

### D.    UTPCPL Claims

16.    Last, Abramov "maintains the viability of" his UTPCPL claims. (Doc. No. 75 at 10–11.) At the close of Abramov's case, the Court granted Defendants' motion for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c) because Abramov had failed to adduce any evidence that he justifiably relied on any deceptive act by Defendants or that the

---

licenses and certificates). The Court need not decide the issue of recovery, however, because, as discussed in Section I.C. of the Court's Conclusions of Law, Defendants did not violate § 9-804.

identified acts harmed him in such a manner that he was entitled to disgorgement of past rent payments. (*See* Trial Tr. at 144:15–23.) At trial, Abramov's UTPCPL claims focused on Maggie Bullard's October 2, 2023 assertion that she was not his landlady/not associated with Konkrete Investments, and he argued that this assertion was deceptive because Maggie Bullard's name appears on Konkrete Investments' corporate documents. (*Id.* at 137:1–9.) But now, in his proposed findings of fact and conclusions of law, Abramov asserts that his UTPCPL claims went "beyond the single act of Maggie Bullard," referencing the confusion and purported misdirection that he experienced throughout his tenancy about the identity of his landlord. (Doc. No. 75 at 11.)[15]

17.    Even ignoring the procedural irregularities of raising these additional arguments now, they do not save Abramov's UTPCPL claims, because once again, Abramov has not shown that any of the purportedly deceptive acts harmed him in such a way that he is entitled to disgorgement of past rent payments. *See Yoca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425,

---

[15] Specifically, Abramov identifies the following actions as deceptive:

> Konkrete Investments, LLC is identified as the landlord on the face of the lease when 1620 Cecil B Moore, LLC is the actual landlord; the lease agreement did not contain any contact information for a landlord or property manager; City Wide Realty did not accept notice from Mr. Abramov; Watchmen Property Management's number for announcements to tenants by text did not accept formal notice by directing Mr. Abramov to use watchmenpm@gmail.com; the email watchmenpm@gmail.com was unresponsive; the AppFolio platform's email used to send the May 13 Notice to Quit was unresponsive; the phone number in the tenant's app to reach the landlord or property manager was unresponsive; [t]he addresses of public record for Konkrete Investments, LLC and Mr. Shawn Bullard as the registered agent of Konkrete Investments, Inc. were vacant and could not receive certified mail; and, the Defendants' business office at 1611 West Montgomery Avenue was locked and unresponsive during regular business hours after March 4, 2024.

(Doc. No. 75 at 10–11 (citations omitted).) Abramov did not raise these issues when arguing the Rule 52(c) motion, and notably, many of these identified actions were taken by Watchmen PM or City Wide Realty, which are not Defendants in this action.

28

438 (Pa. 2004) ("To bring a private cause of action under the UTPCPL, a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm *as a result of that reliance*." (emphasis added)); *Weinberg v. Sun Co.*, 777 A.2d 442, 446 (Pa. 2001) ("The statute clearly requires, in a private action, that a plaintiff suffer an ascertainable loss *as a result of* the defendant's prohibited action."). To put it simply, the fact that Defendants refused to identify Abramov's landlord, did not *cause* Abramov to make any specific rent payment. And even if Abramov could show that it did, there is nothing to suggest that Abramov somehow was *harmed* by having paid rent because he concedes *he lived in the unit* for the entire time that he paid rent.

*    *    *

The Court reiterates our prior holding that Abramov failed to show that Defendants are liable under the UTPCPL.

## II.    DEFENDANTS' COUNTERCLAIM

18.    That leaves Defendants' counterclaim for breach of contract, which seeks to recover three months of unpaid rent payments. (*See* Doc. No. 74 at 10.)[16] However, the Philadelphia Code precludes Defendants from bringing a claim to recover those payments because they failed to give Abramov a copy of the Certificate of Rental Suitability when he took possession of the unit. *See* Phila. Code § 9-3901(4)(e) ("Any owner who fails to . . . comply with Section 9-3903 regarding a Certificate of Rental Suitability . . . *shall be denied the right to* recover possession of the premises *or to collect rent during or for the period of noncompliance* . . . ." (emphases added)); *id.* § 9-3903(a) ("The owner of any property for which

---

[16] Defendants only seek to recover three months of rent because they applied Abramov's security deposit to cover the fourth month of unpaid rent. (*See* Trial Tr. at 215:6–13.)

29

a rental license is required shall, at the inception of each tenancy, provide to the tenant a Certificate of Rental Suitability that was issued by the Department no more than sixty days prior to the inception of the tenancy."); *Ricchetti*, 2016 WL 5253395, at *6 ("[T]he failure of a landlord to have a housing inspection license or obtain *and provide* a Certificate of Rental Suitability and handbook to a tenant provides a defense to an action by the landlord to collect unpaid rent." (emphasis added)); *cf. Goldstein*, 2011 Phila. Ct. Com. Pl. LEXIS 419, at *13–14 (collecting cases that "clearly held that the unlicensed party may not bring an action to enforce the contract and the other party may use the lack of a license as a defense to any such action"); *Frempong*, 209 A.3d at 1010 (finding landlords are foreclosed from collecting unpaid rent where they failed to obtain a valid certificate of rental suitability because § 9-3901(4)(e) states that any owner who fails to do so "shall be denied the right to recover possession of the premises or to collect rent during or for the period of noncompliance").

*    *    *

Because Defendants did not give Abramov a copy of the Certificate of Rental Suitability during his tenancy, the Philadelphia Code provides a complete defense, and the Court holds Abramov is not liable to Defendants for the unpaid rent payments.

<h2 style="text-align:center">CONCLUSION</h2>

In sum, the Court rules in Defendants' favor on Abramov's claims, and the Court rules in Abramov's favor on Defendants' counterclaim.  No party is entitled to damages or equitable relief.  An appropriate order follows.